# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LORETTA J. ALIRES,

       Plaintiff,

v.                                     CV 10-1236 JAP/WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

On December 3, 2007, Loretta J. Alires filed applications for disability insurance benefits and supplemental security income. (Administrative Record ("AR") 99-107.) The applications were denied at the initial and reconsideration levels, and Alires requested a hearing before an administrative law judge ("ALJ"). (AR 51-63.) The ALJ denied the application in a decision upheld by the Appeals Council. (AR 1-3, 7-9.) Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. Alires seeks review of the Commissioner's decision, so she filed a Motion to Reverse or Remand and Memorandum in Support. (Docs. 20 & 21.) The Commissioner responded (Doc. 23), and Alires replied (Doc. 24). The Court referred the case to me for a recommendation as to the final disposition. (Doc. 17.) After having read and carefully considered the record, pleadings, and relevant law, I find that the Commissioner's decision is supported by substantial evidence and recommend that the motion be denied.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*,

365 F.3d 1208, 1214 (10th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Id.* I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.*

### SEQUENTIAL EVALUATION PROCESS

The Social Security Administration ("SSA") has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, she is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### FACTUAL BACKGROUND

Alires, a fifty-two year old woman with an eleventh grade education and a twenty year work history as a cook with the West Las Vegas District Schools, alleges that she is disabled due to carpal

tunnel syndrome, chronic pain in her joints and lower back, depression, insomnia, and blurred vision. (AR 31, 135-48.) She claims that her disability rendered her unable to work beginning on November 16, 2007. (AR 115.)

For the purposes of this order, it is unnecessary to recount Alires' entire medical history. She did receive medical treatment, though, including physical therapy with Alta Vista Physical Therapy, a neurological examination for carpal tunnel syndrome at High Desert Neurology, and primary care at Rodeo Family Medicine. (AR 138-39, 144, 181-86, 191, 201-18, 220-24, 229-38, 247-57, 280-307.) She was treated at Rodeo Family Medicine primarily by Linda Ross, CFNP, who opined on November 28, 2007 that Alires could not continue to work in her previous position. (AR 191.) Ross later suggested that Alires would be a suitable candidate for job retraining. (AR 279.)

Additionally, Alires was evaluated by two consultative examiners on behalf of the SSA. (AR 225-27, 259-62.) The physical consultative examiner, Martin Trujillo, MD, concluded that Alires suffered only from carpal tunnel syndrome, rendering her limited in the repetitive use of her hands despite full range of motion, good grip, and the ability to appose her fingers to her thumbs with strength and without pain. (AR 226.) The psychological consultative examination by Michael Gzaskow, MD, revealed that Alires was cooperative, alert, able to recount her medical and personal history, and mildly depressed when discussing her ongoing pain. (AR 259-62.) Dr. Gzaskow found Alires to be of average intelligence and oriented in all spheres with quick and accurate calculations and abstractions. (AR 261.) In summary, though, Dr. Gzaskow diagnosed "[m]ood disorder secondary to medical conditions" and "[d]epression/anxiety," and he stated that Alires' ability to relate to others is often compromised by isolation, withdrawal, and irritability, that she "can understand directions in a structured/supportive environment," and that she can attend to simple tasks. (AR 262.)

3

On July 29, 2009, ALJ Dan Dane held a hearing on Alires' applications for benefits. (AR 30.) Alires was represented by counsel, and she and vocational expert ("VE") Barbara Dunlap testified. (AR 28-46.) Alires explained that she stopped working because her doctor told her that her pain would not improve if she maintained her job as a cook and that, in the future, she would be unable "to get around . . . ." (AR 31.) She described extreme pain due to carpal tunnel syndrome that radiates from her neck to her fingers, making it difficult to lift, stir, and hold items. (AR 33-34.) Though her doctors told her numerous times that she requires surgery for carpal tunnel syndrome, she has not undergone surgery because she does not believe it will help her. (AR 37.) She further described experiencing pain and weakness in her back and legs after standing for more than thirty minutes. (AR 35.) Finally, she asserted that she has depression because of seeing other people do things that she does not or cannot do. (AR 36.)

The ALJ then provided a hypothetical to the VE, identifying a person under the age of fifty with a limited education and the ability to work at the light exertional level. (AR 39.) He recited that the individual has full range of motion in her wrists and fingers but is limited in the repetitive use of her hands. (AR 39-40.) He further asked the VE to assume that the person could understand directions in a structured or supportive environment and could relate to others but sometimes had problems including irritability resulting in some limitation in interaction with co-workers and the public. (AR 40.) The VE considered unskilled, light exertion jobs requiring only superficial interaction with the public and coworkers and no collaboration or dispute resolution. (AR 40.) The VE testified that the hypothetical person could perform the jobs of usher, restaurant or cafeteria cashier, and office helper (file clerk or copy clerk). (AR 40-41.)

### ALJ AND APPEALS COUNCIL DECISIONS

The ALJ denied Alires' claim for benefits on January 28, 2010. (AR 10-23.) He determined

that she met the insured status requirements and had not engaged in substantial gainful activity since her alleged onset date. (AR 12.) He found that she had a severe impairment of bilateral carpal tunnel syndrome because the impairment would have a more than slight effect on her ability to work, but he concluded that the impairment did not meet or equal a listing. (AR 12, 14.) In addition, he found that her alleged visual impairment did not more than minimally affect her ability to work and that her alleged depression did not meet the duration requirements to obtain benefits. (AR 13.) He noted that Alires reported no problems with personal care, preparing meals, doing housework, getting along with those around her, paying attention, or following instructions. (*Id.*) Nonetheless, the ALJ found that she was mildly limited in activities of daily living, social functioning, and concentration, persistence and pace. (AR 14.)

The ALJ then determined Alires' RFC to include the capacity to do light work with a few additional restrictions. (*Id.*) First, he found that she has full range of motion in her wrists and fingers "but is limited in repetitive use of her hands." (*Id.*) Second, he found she has some limitation in interaction because she can become irritable due to her chronic pain. (*Id.*) Last, he found that she is limited to a supportive environment to enable her to understand directions. (*Id.*) To make these findings, the ALJ carefully and thoroughly summarized Alires' testimony at the hearing and her medical records. (AR 15-20.) The ALJ emphasized that, despite her claims of pain and depression, the claimant declined surgery and did not completely comply with physician recommendations of exercise and volunteer work. (AR 16-18.) He found "no objective sign of an incapacitating impairment even considering subjective complaints credible to the extent that they are supported by the evidence of record." (AR 19-20.) He further stated that "[t]he record establishes the claimant manages her personal needs, and socializes. The record documents no memory problems, and the record fails to support her allegations of incapacitating pain." (AR 20.)

Based on the RFC and using the Medical-Vocational Guidelines, the ALJ determined that Alires could not perform her past relevant work. (AR 20.) He then relied on the VE's testimony to conclude that Alires could perform other work existing in significant numbers in the national economy, including work as a hostess/greeter/usher, a restaurant or cafeteria cashier, and an office helper. (AR 21-22.) Therefore, the ALJ concluded that Alires was not disabled. (AR 22-23.) The Appeals Council denied her subsequent request for review on October 29, 2010, and the ALJ's decision became the final decision of the Commissioner. (AR 1-3.)

### ANALYSIS

Alires attributes three errors to the ALJ, each of which could require reversal of the ALJ's decision and remand to the SSA. She first claims that the ALJ violated his duty to develop the record by failing to determine what Dr. Gzaskow meant regarding Alires' ability to understand directions and by failing to further define that limitation in the RFC finding and the hypothetical posed to the VE. (Doc. 21 at 3-7.) Second, she asserts that the ALJ committed legal error by failing to inquire of the VE whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.* at 7-8.) Finally, she contends that the ALJ's step five determination was unsupported by substantial evidence because the VE's testimony did, in fact, conflict with the DOT. (*Id.* at 8-11.)

### I.    Duty to Develop the Record:

Alires' first assessment of error is that the ALJ adopted Dr. Gzaskow's findings by stating that Alires "has nonexertional limitations associated with depression wherein she can understand directions and instruction in a supportive environment . . ."[1] but failed to determine what Dr.

---

[1] In whole, the ALJ stated that "she has nonexertional limitations associated with depression wherein she can understand directions and instructions in a supportive environment with some limitation in interaction secondary to irritability due to chronic pain while in the performance of job duties." (AR 14.) It is unclear whether the ALJ intended the language about the supportive environment to be a limitation, but I will assume

Gzaskow meant by "structured/supportive environment." (Doc. 21 at 3.) Undoubtedly, Dr. Gzaskow did not define the phrase or provide support for that finding. Instead, the VE expounded on the meaning of this phrase when describing how the enumerated jobs satisfied the hypothetical:

> [T]hey're unskilled jobs so these are jobs that are fairly routine in nature. So there's no variability of the task. So that is a structured type of environment or structured type of job. Supportive, there is no independent decision-making required. The supervisor basically explains the job, oversees the job, supports the employee. It's not an adversarial type of environment.

(AR 41.) The ALJ adopted that definition, asserting in his decision that the phrase "structured/supportive environment" is not a term of art in the medical/vocational field. (AR 20.) He explained that all competitive employment is structured by daily work hours and work rules, and that most work is supported in that it depends on the work of others. (*Id.*) He concluded that "[t]he attempt to make this term a description of workplace limitations rapidly deteriorates into nonsense . . . ." (*Id.*)

"It is beyond dispute that the burden to prove disability in a social security case is on the claimant." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (citing *Hill v. Sullivan*, 924 F.2d 972, 974 (10th Cir. 1991)). Because a social security disability hearing is a nonadversarial proceeding, though, the ALJ is responsible for ensuring "that an adequate record is developed during the disability hearing consistent with the issues raised." *Id.* (quoting *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)). Where a physician's opinion is inadequate to determine whether a claimant is disabled, the ALJ has a duty to re-contact that physician to further develop the record with the necessary information. *White v. Barnhart*, 287 F.3d 903, 905, 908 (10th Cir. 2001); 20 C.F.R. §§ 404.1512(e), 416.912(e). A violation of the duty to

---

that he did set a limitation on Alires' work environment.

develop the record is legal error requiring remand. *Madrid v. Barnhart*, 447 F.3d 788, 791-92 (10th Cir. 2006).

In this case, as a preliminary matter, the evidence indicates that Alires' ability to understand directions is not impaired. In forms submitted to the SSA, both Alires and her daughter repeatedly wrote that Alires has no problem understanding or following instructions. (*See* AR 124, 132, 155.) One of Alires' personal doctors (signature illegible) completed an educational assessment indicating that Alires was independently able to comprehend, was motivated to ask questions, was alert, and had no barriers to communication. (AR 207.) The totality of Dr. Gzaskow's examination demonstrates that Alires had no problems answering his questions or following directions. (*See* AR 259-62.) Furthermore, even his mention of a "structured/supportive environment" did not appear to be a limitation to a certain type of working environment; rather, her ability to understand directions was used by Dr. Gzaskow to highlight that she claimed to have difficulty following through on directions. (*See* AR 262.)

Nonetheless, the ALJ did state that Alires could understand directions in a supportive environment. The VE described the meaning of this term and explained how the enumerated jobs met that definition. The ALJ adopted the VE's description. Based on the VE and the ALJ's definition, a structured and supportive environment is easily compatible with competitive, remunerative work, and there is no support for Alires' contention to the contrary. (*See* Doc. 21 at 5-6.)

Alires cites to several sources regarding determinations of disability for children and young adults. She argues that the phrase used by Dr. Gzaskow could be consistent with the phrase as it is used in various administrative regulations and policies, such as 20 C.F.R. § 416.924a and the listing of impairments. The cited regulations and policies address serious mental impairments. For example,

under the heading "Structured or supportive settings," 20 C.F.R. § 416.924a begins, "If you have a serious impairment(s), you may spend some or all of your time in a structured or supportive setting, beyond what a child who does not have an impairment typically needs." 20 C.F.R. § 416.924a(b)(5)(iv)(A). The listing of impairments related to mental disorders states,

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you.

20 C.F.R., Pt. 404, Subpt. P, app. 1, § 12.00F.

Even if these regulations did define structured or supportive environments for adults with only mild psychological limitations, the VE and the ALJ considered Alires' identified need for support to understand directions and explained how the environment of the enumerated jobs would support that need. However, Alires cannot genuinely argue that the regulations should apply to determinations of disability in adults without severe mental impairments. The ALJ found that Alires' sole serious impairment was carpal tunnel syndrome, which is unrelated to her ability to understand directions. It strains credibility to argue that Dr. Gzaskow intended for Alires to only work in a highly supportive environment like the intensive care facilities contemplated by the regulation and policy quoted above. Clearly, the regulation and the policy contemplate more serious mental limitations than those possessed by Alires, and I find no merit to this argument.

Dr. Gzaskow's opinion was adequate to determine whether Alires was disabled, so the ALJ was not required to re-contact him to determine the definition of "structured/supportive environment." The ALJ's RFC determination was supported by substantial evidence. Accordingly, the ALJ did not err in finding that the enumerated jobs provided the necessary structure and support for Alires.

**II.     Inquiry of the VE:**

Alires next argues that the ALJ committed legal error requiring remand because he did not ask the VE whether her testimony was consistent with the DOT. (Doc. 21 at 7-8.) The Commissioner acknowledges that the ALJ failed to inquire about the relationship between the DOT and the VE's testimony. (*See* Doc. 23 at 8.) However, the Commissioner asserts that a remand is improper unless there is an actual unresolved conflict between the VE's testimony and the DOT. (*Id.*)

When a VE provides evidence about vocational requirements during a disability hearing, the ALJ has an affirmative duty to ask the VE about possible conflicts between the VE's testimony and the information provided in the DOT. *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). The Tenth Circuit has found that duty satisfied even when the ALJ does not directly ask the VE about discrepancies with the DOT so long as the VE makes clear that she relied on the DOT in her testimony. *Gibbons v. Barnhart*, 85 F. App'x 88, 93 (10th Cir. 2003) (unpublished). Furthermore, even where an error is committed, the decision of the SSA may only be reversed where the VE's testimony actually conflicts with the DOT. *See Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009); *Hackett v. Barnhart*, 395 F.3d 1168, 1175-76 (10th Cir. 2005).

Here, the ALJ did not ask the VE whether her testimony was consistent with the DOT, but the VE did mention the DOT in her testimony by describing the titles of the occupations and the specific vocational preparation ("SVP") levels set out in the DOT. (*See* AR 40-41.) It appears from her testimony, then, that the VE relied on the DOT in order to identify jobs available to the hypothetical individual. I need not determine whether the ALJ did commit error, though, because even if he did err, remand is only warranted if the DOT information actually conflicts with the testimony provided by the VE. I will address that issue in the following section.

### III.    Consistency between VE Testimony and DOT Information:

Alires' final assertion of error is that the ALJ's step five findings are not supported by substantial evidence because the VE's testimony was inconsistent with the DOT and her RFC. (Doc. 21 at 8-11.) Alires' first contention, that the ALJ did not include the limitation of a structured/supportive environment in his hypothetical (Doc. 21 at 8), is blatantly incorrect. While the ALJ is required to include all impairments borne out by the record with precision in asking the VE a hypothetical question, *see Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995), the ALJ did so here. In crafting the hypothetical, the ALJ expressly said that the individual could "understand directions in a structured or supportive environment . . . ." (AR 40.) I find no error on this ground.

Second, Alires argues that the reliability of the VE's testimony cannot be assessed because she did not provide DOT codes for the jobs that she identified. (*Id.* at 8-9.) While providing specific DOT codes does assist the court reviewing the SSA decision, it is not reversible error to omit the codes. Contrary to Alires' assertion, the VE is not required to identify the specific code in the DOT; rather, she must identify a specific job in the DOT, including its particular requirements. *See Carpenter v. Astrue*, 537 F.3d 1264, 1270-71 (10th Cir. 2008). In this case, the VE specifically stated the title of the jobs ("usher," "cafeteria cashier," and "office helper"), the exertional level ("light"), and the SVP level ("2"). (AR 40-41.) Given these parameters, the identified jobs could be located in the DOT with ease.[2]

_____

[2] The applicable titles and codes in the Dictionary of Occupational Titles are "Usher," 344.677-014, "Cashier II," 211.462-010, and "Office Helper," 239.567-010. For some reason, Alires' motion referenced two DOT jobs and codes that are not compatible with the job descriptions provided by the VE. (Doc. 21 at 9-10 (citing the jobs Host/Hostess (hotel and restaurant), DOT 310.137-010 and Cashier I (clerical), DOT 211.362-010).) The VE stated that each job was light exertion with an SVP level of 2. DOT 310.137-010 is defined as a restaurant host or hostess, which the VE mentioned when discussing the position called "usher," but the SVP is 6. 1991 WL 672671 (4th ed. 1991); *see also* Doc. 21 at 9-10. The second listed occupation, a restaurant or cafeteria cashier, is clearly a reference to the Cashier II position and not the Cashier I position, or DOT 211.362-010, which requires an SVP of 5. *See* 1991 WL 671835 (4th ed. 1991); *see also* Doc. 21 at

Lastly, Alires asserts that the DOT job descriptions require a level of interaction with co-workers and the public and a level of use of hands that is incompatible with Alires' RFC. (*Id.* at 9-10.) The ALJ expressly found that the VE's testimony complied with the hypothetical and was consistent with the DOT. (AR 22.) To determine whether that finding was accurate, it is first important to determine Alires' limitations as explained by the ALJ.[3] The ALJ found Alires somewhat limited in interacting with others due to the irritability that she experiences secondary to pain. (AR 14.) He explained that, as a result, she could only superficially interact with the public. (AR 21.) The ALJ also found Alires limited in the repetitive use of her hands. (AR 14.) He qualified that limitation by stating that she has full range of motion in her wrists and fingers. (*Id.*)

Next, I must assess the requirements of the jobs that the VE cited as compatible with Alires' limitations. The office helper position requires only sporadic interaction with others, so it does not exceed Alires' limitation in interaction. DOT 239.567-010, 1991 WL 672232 (4th ed. 1991). A cashier II is essentially responsible for computing bills, taking money, and providing change; a person in this position must deal with people by talking and listening frequently in order to exchange information. DOT 211.462-010, 1991 WL 671840 (4th ed. 1991). An usher is charged with giving out programs at events and leading or directing patrons to their seats, which requires the usher to be in frequent contact with people and to respond to their needs. DOT 344.677-014, 1991 WL 672865 (4th ed. 1991). Keeping in mind that Alires is not limited in superficial interactions with others, it is clear that the job requirements do not conflict with Alires' RFC. When these positions require interaction with others, the interactions are brief and do not require problem solving,

9-10.

[3] Alires does not contest the ALJ's RFC finding. Therefore, the ALJ's discussion of the RFC is accepted by the Court as a complete statement of Alires' limitations.

collaboration, or joint decision making. DOT 344.677-014, 1991 WL 672865 (4th ed. 1991); DOT 239.567-010, 1991 WL 672232 (4th ed. 1991); DOT 211.462-010, 1991 WL 671840 (4th ed. 1991).

While the usher position requires infrequent use of the hands and only occasional handling and fingering, the other two positions require frequent handling and fingering, defined as existing one-third to two-thirds of the time. DOT 344.677-014, 1991 WL 672865 (4th ed. 1991); DOT 239.567-010, 1991 WL 672232 (4th ed. 1991); DOT 211.462-010, 1991 WL 671840 (4th ed. 1991). In arguing that these jobs are inconsistent with her RFC, Alires presumes that "frequent" is synonymous with "repetitive." While the VE did not provide explicit testimony on this issue, the Tenth Circuit has affirmed that frequent use of the hands is not equivalent to repetitive use of the hands. *Gallegos v. Barnhart*, No. 03-2072, 2004 WL 1203031, at *2 (10th Cir. June 2, 2004) (unpublished). Instead, repetitive use of the hands has been defined as using the hands for two-thirds to all of the workday. *Id.*; *see also Schassar v. Astrue*, No. 08-2546-JWL, 2009 WL 3241597, at *7 (D. Kan. Oct. 5, 2009) (unpublished). Thus, neither the case law nor the DOT support Alires' assertion that "[a]ccording to the DOT these jobs entail repetitive use of the hands." I find that there is no conflict between the DOT and the testimony of the VE.

Despite the fact that the ALJ did not ask the VE about the relationship between her testimony and the DOT, the testimony was clearly based on the DOT and there are no apparent conflicts between her testimony and the DOT. Accordingly, if any error occurred, it is harmless. *See Poppa*, 569 F.3d at 1174 (citations omitted). I conclude that the ALJ satisfied his burden of proving that there are jobs in significant numbers in the national economy that Alires is capable of performing given her age, education, experience, and RFC.

13

## RECOMMENDATION

For the foregoing reasons, it is recommended that the Plaintiff's motion (Doc. 20) be

DENIED and that the decision of the Commissioner be AFFIRMED.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.